707 F.2d 565
 227 U.S.App.D.C. 368
 MEMPHIS LIGHT, GAS AND WATER DIVISION, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Texas Gas Transmission Corporation, Terre Haute Gas
Corporation, Intervenors.
MEMPHIS LIGHT, GAS AND WATER DIVISION, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
United Gas Pipe Line Company, Texas Gas Transmission
Corporation, Texas Eastern Transmission
Corporation, Intervenors.
 Nos. 81-2356, 82-1302.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 23, 1982.
Decided May 6, 1983.
 
 Petitions for Review of Orders of the Federal Energy Regulatory commission.
 Reuben Goldberg, Washington, D.C., with whom Glenn W. Letham, Washington, D.C., was on the brief, for petitioner. Channing D. Strother, Jr., Washington, D.C., also entered an appearance for petitioner in 81-2356.
 Andrea Wolfman, Atty., F.E.R.C., Washington, D.C., with whom Barbara J. Weller, Deputy Sol., F.E.R.C., Washington, D.C., was on the brief, for respondent.
 
 
 1
 Cecil W. Talley, Houston, Tex., with whom Thomas W. Pounds and Irving Jacob Golub, Houston, Tex., were on the brief for United Gas Pipe Line Co., intervenor in 82-1302.
 
 
 2
 Christopher T. Boland, Washington, D.C., with whom J. Derrill Cody and William A. Williams, were on the brief for Texas Gas Transmission Corp., intervenor in 81-2356 and 82-1302.
 
 
 3
 J. Evans Attwell, Houston, Tex., also entered an appearance for Texas Eastern Transmission Corp., intervenor in 82-1302.
 
 
 4
 Albert J. Feigen, Washington, D.C., also entered an appearance for Terre Haute Gas Corp., intervenor in 81-2356.
 
 
 5
 Before MIKVA and EDWARDS, Circuit Judges, and SWYGERT,* Senior Circuit Judge, United States Court of Appeals for the Seventh Circuit.
 
 
 6
 Opinion for the Court filed by Circuit Judge MIKVA.
 
 MIKVA, Circuit Judge:
 
 7
 These two petitions for review of orders of the Federal Energy Regulatory Commission (FERC or Commission) represent the latest episode in the continuing saga of the Commission's treatment of accelerated depreciation when taxes are computed as an includable expense in cost of service. Specifically at issue is the Commission's reaction, in the context of the "normalization" method of depreciation currently used by natural gas companies, to recent reductions in the corporate income tax rate. The petitioner in both of these cases, Memphis Light, Gas and Water Division (Memphis), claims that rates included in various settlement agreements and approved by the Commission improperly use higher tax rates that are no longer in effect. As a consequence, Memphis contends, the settlements provide for excess collections that either should be returned to the ratepayers or credited against future collections. Given that the courts have allowed the Commission broad discretion in establishing proper depreciation methods for ratemaking purposes, and that the Commission's treatment of declining tax rates as evidenced in these cases is a reasonable exercise of that discretion, we affirm each of the orders being challenged.
 
 I. BACKGROUND
 
 8
 Under Section 4 of the Natural Gas Act, 15 U.S.C. Sec. 717c (1976), the Commission is required to determine "just and reasonable" rates that will be sufficient for a natural gas company to recover its costs of service and to obtain a fair return on its investment. Traditionally included as a cost of service is a proper allowance for federal income taxes. Although the federal tax laws specify depreciation methods for income tax purposes, courts normally have granted the Commission broad discretion in establishing proper depreciation methods for ratemaking purposes. See FPC v. Memphis Light, Gas & Water Division, 411 U.S. 458, 466-67, 93 S.Ct. 1723, 1728-29, 36 L.Ed.2d 426 (1973). The petitions for review filed in these cases challenge the Commission's exercise of that discretion, not because of the particular method of depreciation used by the companies, but for the way that method has been adjusted in order to take account of declining tax rates.
 
 
 9
 A. The Commission's Treatment of Accelerated Depreciation
 
 
 10
 Under section 167 of the Internal Revenue Code, I.R.C. Sec. 167 (1976 & Supp. V 1981), natural gas companies and other utilities are permitted to depreciate their properties for income tax purposes using an accelerated or liberalized method of depreciation rather than the straight-line method that usually is used for bookkeeping purposes. Cf. id. Sec. 168 (Supp. V 1981) (including latest depreciation rules, but not applying to property placed in service before January 1, 1981). The use of such an accelerated depreciation schedule results in higher deductions and lower taxes for a utility in early years, and theoretically lower deductions and higher taxes in later years. The deferral aspects of accelerated depreciation are theoretical because, given constantly expanding investments made by utilities and continuous inflation in the economy, a utility is able to avoid the "turnaround" point when taxes are supposed to become higher than under the usual straight-line method. Thus, the accelerated depreciation methods sanctioned by section 167 often result in large and permanent tax savings for a utility. See Alabama-Tennessee Natural Gas Co. v. FPC, 359 F.2d 318, 328 (5th Cir.), cert. denied, 385 U.S. 847, 87 S.Ct. 55, 17 L.Ed.2d 78 (1966); see also Public Systems v. FERC, 606 F.2d 973, 976 (D.C.Cir.1979).
 
 
 11
 The use of section 167 by utilities presents the Commission with a ratemaking problem when taxes are included in cost of service. Two basic methods of accounting for accelerated depreciation have been utilized at various times. The "flow-through" method allows a utility to include in cost of service only those taxes actually paid in a given year, thus ensuring that the benefits of accelerated depreciation flow directly to customers of the utility. The "normalization" method, currently applied by the Commission, is somewhat more complicated. Under normalization, the ratepayers are charged not the actual income taxes paid, but a hypothetical higher figure for taxes (i.e., the "tax allowance") computed as if the utility was using a straight-line method of depreciation. The difference between the actual taxes paid and the larger tax allowance charged to the ratepayers is accumulated in a "deferred tax account." Assuming that the utility's actual taxes will someday become higher than the amount charged to the ratepayers (i.e., after the turnaround point), the deferred tax account then will be drawn upon to finance the extra tax payments that must be made by the utility.
 
 
 12
 Several important procedures result from the use of the normalization method and its deferred tax account. First, because the deferred account is composed of monies contributed by the ratepayers and is available to the utility for investment without finance charges, the amount of funds included in the account is deducted from the rate base. In this way, the ratepayers need not pay the utility a rate of return on their own money. Second, because the money collected from ratepayers is a hypothetical amount larger than actual taxes paid, the excess amount is income to the utility in the year it is collected and is taxed as such. These extra taxes are referred to as the "tax-on-tax" effect of accelerated depreciation with normalization, and are charged to the ratepayers along with other tax expenses.
 
 
 13
 When section 167 was first applied in the ratemaking process, the Commission decided that Congress had mandated use of the normalization method. See Amere Gas Utilities Co., 15 F.P.C. 760 (1956). Between 1960 and 1963, however, several courts of appeals concluded that normalization in ratemaking was not required by the tax code, see, e.g., Panhandle Eastern Pipe Line Co. v. FPC, 316 F.2d 659 (D.C.Cir.) (en banc), cert. denied, 375 U.S. 881, 84 S.Ct. 147, 11 L.Ed.2d 111 (1963), and in 1964 the Commission adopted the flow-through method as controlling, see Alabama-Tennessee Natural Gas Co., 31 F.P.C. 208 (1964), aff'd, 359 F.2d 318 (5th Cir.), cert. denied, 385 U.S. 847, 87 S.Ct. 55, 17 L.Ed.2d 78 (1966); cf. Midwestern Gas Transmission Co., 36 F.P.C. 61 (1966), aff'd, 388 F.2d 444 (7th Cir.) (Commission may impute the use of accelerated depreciation with flow-through regardless of the method actually used in computing taxes), cert. denied, 392 U.S. 928, 88 S.Ct. 2286, 20 L.Ed.2d 1386 (1968).
 
 
 14
 Amendments made to section 167 by the Tax Reform Act of 1969, see I.R.C. Sec. 167(l) (1976), led the Commission to change policy once again. The Commission first announced that, as a general policy under section 167(l)(4)(A), it would permit utilities to elect accelerated depreciation with normalization for all their post-1969 expansion property. See FERC Order No. 404, reprinted in 43 F.P.C. 740 (1970), aff'd, Memphis Light, Gas & Water Division v. FPC, 462 F.2d 853, 856-60, 865 (D.C.Cir.1972). Then the Commission announced that utilities also would be allowed to abandon flow-through in favor of normalization for certain replacement properties and for properties acquired prior to 1969. See Texas Gas Transmission Corp., 43 F.P.C. 824 (1970). This latter preference for normalization was initially rejected by this court, 462 F.2d at 860-65; however, given the broad authority of the Commission in this area, and no statutory directives to the contrary, the Commission's decision eventually was affirmed by the Supreme Court in FPC v. Memphis Light, Gas & Water Division, 411 U.S. 458, 93 S.Ct. 1723, 36 L.Ed.2d 426 (1973). Thus, by the mid-1970's, utilities had begun the switch back to full normalization.**
 
 
 15
 The temporary use of the flow-through method between 1964 and the early 1970's, however, resulted in deficiencies in the deferred tax accounts because contributions to the account were not being made during those years. Such deficiencies in the deferred accounts, in turn, mean that normalization cannot be fully utilized as it was designed. Specifically, because these deferred accounts cannot be relied upon completely in later years when a utility's tax liability theoretically will exceed its then-current receipts, ratepayers in some future year might have to bear a very large tax burden. To guard against this possibility, the Commission developed a method--called the South Georgia method--for smoothing the transition to the use of full normalization, see South Georgia Natural Gas Co., FERC Docket No. RP77-32 (1978). Under the South Georgia method, a calculation is taken of the difference between the amount actually in the deferred account and the amount that would have been in the account had normalization continuously been followed. Rather than waiting for this difference to be paid by ratepayers in some future year, the amount is divided into annual increments to be paid over a ten-year period. When the deferred account is fully funded at the end of this transition period, the annual increment ceases.
 
 B. The Texas Gas Proceeding--No. 81-2356
 
 16
 The Texas Gas Transmission Corporation (Texas Gas) is an interstate natural gas pipeline company whose rates are subject to the FERC's jurisdiction. Pursuant to section 4(d) of the Natural Gas Act, Texas Gas filed new tariff sheets requesting a $51.7 million rate increase effective June 1, 1980. After a five-month suspension, the new rates became effective subject to refund if a full administrative hearing determined that they were unjust and unreasonable. Before that hearing was held, however, the relevant parties entered settlement negotiations. Memphis, which owns and operates a municipal distribution system for natural gas and which buys substantial volumes of natural gas directly from Texas Gas, was a party to these discussions. The negotiations eventually produced a stipulation and agreement supported by all parties except Memphis, which opposed the treatment accorded accelerated depreciation under the normalization method.
 
 
 17
 In fact, Texas Gas has been using accelerated depreciation with normalization since its approval by the Commission in the early 1970's. Accordingly, in its rate increase filing and the resulting settlement in this case, Texas Gas included the hypothetical amount larger than actual taxes paid (the tax allowance) so as to provide monies for its deferred account. Moreover, because Texas Gas used the flow-through method during the 1960's, the settlement agreement included an annual increment of over $1.8 million to compensate for those years (the South Georgia increment to continue for ten years). Finally, the settlement also included in cost of service the extra taxes that had to be paid on the tax allowance collected (the tax-on-tax effect described above). By themselves, each of these items is acknowledged to be a proper exercise of Commission discretion, and they are not being challenged in this case.
 
 
 18
 The claims raised by Memphis before the Commission and in this petition for review, however, stem from the impact that the declining statutory income tax rate for corporations has had on these three items. When originally computing the amounts necessary to create the deferred account and to compensate the account for the earlier flow-through periods, Texas Gas and the Commission used the tax rate then in existence. At that time, the tax rate was between 52% and 48%. Since then, however, the applicable tax rate has decreased to 46%. Although this decline in the tax rate affects each of these three items, Memphis claims that the settlement approved by the Commission does not properly reflect this change and therefore keeps the ratepayers from what is rightfully theirs. Specifically, Memphis claims that the reduction in tax rate means that less monies are needed in the deferred account; that the South Georgia increment should also be lowered to reflect the lower tax rate; and that the portion of the tax-on-tax collections representing the higher tax rate should be eliminated.
 
 
 19
 While negotiations were continuing at the administrative stage of these proceedings, Memphis also requested discovery to obtain data relevant to these concerns; Texas Gas, however, refused to comply with this request. A motion to compel discovery was then filed by Memphis, and it was referred to the administrative law judge (ALJ) who also was considering the stipulation and agreement submitted to the Commission for its approval. At a prehearing conference held during February 1981, the ALJ rejected Memphis' request for discovery because "objections to the Settlement Agreement are matters directed toward law and policy, rather than to material facts in dispute at this point." Transcript of Prehearing Conference, reprinted in Joint Appendix (JA) 26. Thus, the settlement was referred to the Commission, along with the comments of interested parties. On June 8, 1981, an order of the Commission approved the stipulation and agreement, rejected each of the substantive claims raised by Memphis, and denied the request for discovery because no issues of fact existed and because any evidence gathered would prove to be immaterial. See Texas Gas Transmission Corp. (Texas Gas), FERC Docket No. RP80-101 (1981), reprinted in JA 52-61. After the filing of an application for rehearing, the Commission denied that request in another written order. JA 98-102. This timely petition for review followed.
 
 C. The United Proceeding--No. 82-1302
 
 20
 The United Gas Pipe Line Company (United) sells substantial volumes of natural gas to Texas Gas, and thereby indirectly sells its natural gas to Memphis. On July 1, 1980, United filed new tariff sheets with the Commission providing for a $58.5 million increase in annual rates and charges. After submission of revised tariff sheets and a five-month suspension, the rates became effective subject to refund on January 1, 1981.
 
 
 21
 As in the Texas Gas proceeding, the relevant parties entered settlement discussions which resulted in a stipulation and agreement to which only Memphis objected. Memphis' disagreement with the settlement in this case, however, is limited to the impact that declining tax rates have had on the tax-on-tax effect--the third issue raised in the Texas Gas proceeding. Moreover, contrary to the procedure followed in the Texas Gas proceeding, a motion seeking discovery was granted and Memphis was allowed to admit testimony and other evidence on this issue in a hearing before an ALJ. While doing so, the full Commission issued its order in Texas Gas, preempting the only issue being contested. Nonetheless, the ALJ allowed the parties to proceed through the full evidentiary hearing before finding the Texas Gas decision binding. The Commission likewise approved the settlement agreement by relying on its earlier decision, see United Gas Pipe Line Co., FERC Docket No. RP80-121 (1982), reprinted in JA 208-13. An application for rehearing was denied by operation of law, and this petition for review followed.
 
 II. EXCESSES IN THE DEFERRED ACCOUNT
 
 22
 The first issue before this court, raised only in the Texas Gas proceeding, directly concerns the deferred tax account that has been established by Texas Gas pursuant to the normalization method of accounting for accelerated depreciation. Specifically, because the amounts collected to create the deferred account have been based on prior tax rates that exceed the present rate, Memphis claims that this reserve for deferred taxes is in excess of any deferred tax liability that Texas Gas might incur in the future.
 
 
 23
 The parties engage in a semantic dispute over whether the deferred account is truly "excessive"--Memphis claims that the balance in the deferred account is plainly excessive, while the Commission and Texas Gas claim that, although the account may appear to be excessive, there can be no actual excess when an overall deficiency in the account still exists. Assuming that Congress does not increase tax rates above the level at which the deferred account was first computed, the balance in the account is most appropriately characterized as ahead of schedule. That is, the balance is currently higher than necessary given initial projections about collections required for the account, but not yet beyond the point at which the account should be giving out money rather than taking it in. Thus, monies in the account exceed the levels projected as necessary at this point to fulfill the purposes of normalization, but an overall deficiency in the account still exists. Obviously, if all else remains the same, the account will reach the turnaround point at an earlier date than originally scheduled.
 
 
 24
 Memphis argues that the Commission should either order refunds to customers or reduce the amounts of future collections until the balance in the deferred account is exactly equal to Texas Gas' deferred tax liability. The Commission considered and rejected these alternatives; instead, it approved the proffered settlement, thereby allowing the temporary excess to be applied to overall deficiencies in the account. The settlement agreement continues collections for the account at past levels, but provides that these collections will be halted once the account covers the level of total future tax liabilities. In other words, the settlement allows current collections of amounts computed when tax rates were higher than the current 46%, but shortens the period of time during which these collections will continue. See JA 58-59.
 
 
 25
 We find that such a procedure is equally reasonable to those proposed by Memphis, and therefore the settlement in this regard was properly approved. Cf. Pennsylvania Gas & Water Co. v. FPC, 463 F.2d 1242 (D.C.Cir.1972) (affirming settlement approved by Commission). The Commission, and settlements approved by the Commission, need not match rates dollar for dollar with taxes paid to the Internal Revenue Service in any particular year. Taxes properly can be recognized in ratemaking either currently, earlier, or later than the time they are actually paid to the Treasury, as long as reasonable attempts are made by the Commission to be fair in its tracking procedures and rational reasons are given by the Commission for any timing discrepancies that are not eliminated.
 
 
 26
 The only basis for complaint by Memphis relates to the time value of money. Because Texas Gas is receiving advance payments for its deferred tax account, Memphis argues, the settlement agreement does not compensate ratepayers for the loss of the time value of their money. In response, the Commission notes that the benefits accruing to Texas Gas from the free use of monies in the deferred account are essentially eliminated when the amounts in the account are deducted from the rate base. JA 60, 99. But that response hardly suffices, because the deduction referred to merely ensures that the ratepayers are not being charged twice for their own money, not that the ratepayers are receiving any compensation for their advance payments. It necessarily follows, however, that the utility does not simply retain the advance payments in a nonproductive way. Rather, it uses the monies from the deferred account productively, either by replacing similar amounts that otherwise would have to be borrowed or by committing the monies to income producing investments. In either case, rates are reduced because the ratepayers will obtain the advantages of decreased interest expenses or increased interest income. Thus, the overall effect on rates being charged by Texas Gas is a reasonable one and supports the accounting procedures included in the approved settlement in this particular case.
 
 
 27
 III. COMPENSATING THE DEFERRED ACCOUNT FOR PRIOR FLOW-THROUGH YEARS
 
 
 28
 The second issue before this court, also raised only in the Texas Gas proceeding, concerns the South Georgia method used to compensate the deferred account for those years during which Texas Gas employed the flow-through method of accounting. In 1978, when the annual increment to be paid by ratepayers under the South Georgia method was originally calculated, the existing tax rate was 48%. At that time, it was determined that the deferred account could be compensated fully through the addition of $1.879 million to the account in each of the next ten years. By 1979, however, the tax rate had declined to its current 46%. The Commission in that year approved an agreement under which the annual increment continues at its originally computed level, but the increment is collected for a period of time shorter than ten years. In this way, the cumulative effect of the annual increments will exactly equal the deferred tax liabilities that Texas Gas will incur after reaching the turnaround point of accelerated depreciation.
 
 
 29
 Although Memphis apparently acquiesced in the 1979 agreement, it now argues that the annual increment should be recalculated and decreased while the period of collection remains constant. Instead, the Commission-approved settlement presently under review ensures that the agreement reached in 1979 essentially remains intact--annual increments of $1.879 million will continue, but only until the deferred account is fully funded as required by the South Georgia method. This settlement procedure, like that discussed in part II, is a reasonable accommodation of the recent decline in tax rates. Given the broad discretion inherent in the Commission's ratemaking decisions, especially when presented with a settlement proposed by a majority of the interested parties, there is no reason not to affirm the Commission's order on this issue.
 
 IV. THE TAX-ON-TAX EFFECT
 
 30
 The final issue before this court, and the one raised in both the Texas Gas and United proceedings, concerns the tax-on-tax effect. As discussed above, the normalization method of accelerated depreciation requires that a utility collect a hypothetically larger amount from taxpayers (i.e., the tax allowance) in order to supply funds for the deferred tax account. Because the tax allowance does not compensate the utility for its current expenses, it must be considered income to the utility in the year it is collected. As income, it is taxed at the corporate tax rate then in existence. These taxes, in turn, are charged to the ratepayers as a proper cost of service for that year. Thus, if a utility needs to add one dollar to its deferred tax account during a year when the applicable tax rate is 50%, a total of two dollars would have to be collected from the ratepayers. Hence, the tax-on-tax effect.
 
 
 31
 In earlier years, when the applicable tax rate was higher than the 46% now in effect, both Texas Gas and United were allowed to compute the tax-on-tax using the tax rates then in existence. If tax rates had remained constant, the amount of tax-on-tax paid by ratepayers during those years theoretically would have been offset by equivalent reductions in taxes charged to ratepayers in future years. Due to the recent decline in tax rates, however, and assuming no future increase in tax rates, some of the amounts previously paid by ratepayers will not be offset by equivalent savings in later years. Memphis claims, therefore, that the tax-on-tax collected in previous years at tax rates above 46% were excessive and should be returned to the ratepayers, either through refunds from past rates or credits to future rates.
 
 
 32
 The Commission properly rejected these arguments, see JA 60-61, 98-99, noting that rates based on the corporate income tax in effect at the time they are set are reasonable and lawful when established. Changes in tax rates need not be applied retroactively, but must only be reflected in rates charged to ratepayers for the years during which the new tax rates are applicable. Thus, if Congress decreases the tax rate to 46% in 1979, rates charged in 1979 must account for the decrease, but rates charged in prior years need not be adjusted after the fact. This is so despite any underlying Commission policy that might exist to make ratepayers whole over the long run. As long as current utility rates charged to ratepayers accurately reflect current tax rates, the Commission reasonably may decide not to reopen or readjust rates established for prior years. Cf. Villages of Chatham & Riverton, Illinois v. FERC, 662 F.2d 23, 34-35 (D.C.Cir.1981) (upholding test year estimates of income tax expense despite subsequent change in rates).
 
 
 33
 This also helps to explain why the Commission did not have to grant Memphis a full evidentiary hearing in the Texas Gas proceeding. Memphis did not argue before the Commission, and does not argue before this court, that rates charged in any particular year have not reflected accurately the tax rate applicable in that year. If such a claim had been made, a genuine issue of fact would have been presented and Memphis might have been entitled to discovery and a hearing. As it was, however, the only allegation made by Memphis that might have been assisted by such procedures concerned Texas Gas' failure actually to pay the tax-on-tax to the Treasury because the utility filed consolidated tax returns during the years in question. Even assuming the truth of Memphis' claim that the tax-on-tax never was paid to the Treasury, however, would provide no reason to require any readjustment to old rates. Indeed, it has been longstanding Commission policy to allow utilities to calculate taxes in cost of service as if they filed their tax returns separately (i.e., on a "stand-alone," rather than a consolidated, basis). See Florida Gas Transmission Co., 47 F.P.C. 341 (1972); cf. City of Charlottesville, Virginia v. FERC, 661 F.2d 945 (D.C.Cir.1981) (Commission has statutory authority to apply "stand-alone" policy, but particular orders must be remanded because not based on substantial evidence). Thus, the Commission properly could conclude that the tax-on-tax dollars collected by the utilities in prior years, even if they were retained by the utilities because they filed consolidated tax returns, were not a necessary matter of inquiry.
 
 
 34
 In sum, the tax-on-tax payment that is included in cost of service each year is a current expense that is, at least theoretically, paid by the utility at the tax rate then in effect. When tax rates are amended by Congress, the Commission must adjust the tax-on-tax amount for the years during which the new tax rate applies. But it is not necessary for the Commission, exercising its reasonable discretion, to reopen old rates that were set and presumably used to pay the utility's tax bills in years past.
 
 CONCLUSION
 
 35
 Given the frequency with which Congress has been known to amend the Internal Revenue Code, and the almost inevitable failure of Congress to consider the effect that such amendments should have on ratemaking, the Commission must have the flexibility to employ different means of adjusting rates to account for changes in taxes. This is especially true when the already court-sanctioned normalization method of accelerated depreciation is at issue, because the Commission has broad discretion to determine depreciation methods for ratemaking purposes. That discretion is not unlimited, however, and the Commission is required to ensure that changes in tax policy are reflected in the rates it approves. The Commission has done so in these cases by approving settlements that account for the decline in corporate income tax rates in a reasonable way. That it chose one set of reasonable alternatives over those urged by the petitioners is not a basis for interfering with the Commission's discretion. The orders of the Commission are affirmed.
 
 
 36
 It is so ordered.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. Sec. 294(d)
 
 
 **
 About the same time, a more general rulemaking was proceeding at the Commission, and eventually led to rules permitting normalization for most other differences in timing between the tax laws and ratemaking. See, e.g., FERC Order No. 530, reprinted in 53 F.P.C. 2123 (1975); id. at 2125 (specifically excluding those timing differences that result from accelerated depreciation). Despite the limits on judicial review earlier established by the Supreme Court, this court found it necessary to remand those rules to the Commission because no reasoned basis--including no careful assessment of the purposes behind the rules and no examination of their consequences for the industry--was provided for the Commission's decisions. See Public Systems v. FERC, 606 F.2d 973 (D.C.Cir.1979). In response to that remand, the Commission reinstituted rulemaking proceedings that not only reaffirmed the agency's preference for normalization but also imposed a normalization requirement on affected utilities. See FERC Order No. 144, reprinted in 46 Fed.Reg. 26,613 (1981); FERC Order No. 144-A, reprinted in 47 Fed.Reg. 8,329 (1982). Judicial review of these latest rules, which continue to exclude accelerated depreciation from their reach, see 18 C.F.R. Sec. 35.25(a)(2)(i) (1982), is currently pending before this court. See Public Systems v. FERC, Nos. 82-1183 & 82-1214 (D.C.Cir. argued Feb. 10, 1983)